FELICE JOHN VITI, Acting United States Attorney (#7007)
CHRISTOPHER MAGNANI, Trial Attorney (MD#1512160075)
Attorneys for the United States of America
950 Pennsylvania Avenue NW • Washington, DC 20530
Telephone: (202) 233-0986 • Facsimile: (202) 532-4251

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> DING WEI CHEN, <br><br> Defendant. | <u>FELONY COMPLAINT</u> <br><br> MAGIS NO.  2:25mj927 CMR <br><br> Count 1: 18 U.S.C. § 371, Conspiracy to Violate the Arms Export Control Act and Smuggle Goods from the United States <br><br> Count 2: 22 U.S.C. § 2778(c), 22 C.F.R. §§ 127.1(a)(4) and (e), Violation of the Arms Export Control Act <br><br> Count 3: 18 U.S.C. § 554(a), Smuggling Goods from the United States |

## Count 1
### (18 U.S.C. § 371)
### Conspiracy to Violate the Arms Export Control Act and
### Smuggle Goods from the United States

Between at least in or about March 2025, and continuing to at least October 1, 2025, the defendant,

**DING WEI CHEN,**

did knowingly, intentionally, and willfully agree and conspire with Co-Conspirator 1 and others unknown to **(A)** export and cause the export of defense articles from the United States to the People's Republic of China without first obtaining a license or written approval from the Department of State, Directorate of Defense Trade Controls, in violation of 22 U.S.C. § 2778(b)(2), (c), 22 C.F.R. §§ 127.1(a)(1), (a)(4), and (e), and **(B)** buy and facilitate the transportation and concealment of defense articles, prior to exportation, knowing the same to be intended for exportation contrary to a law and regulation of the United States, in violation of 18 U.S.C. § 554(a).

In furtherance of this conspiracy, CHEN and his co-conspirators committed and caused to be committed one or more overt acts in the District of Utah and elsewhere, in violation of 18 U.S.C. § 371.

## Count 2
### (22 U.S.C. §§ 2778(b)(2) and (c); 22 C.F.R. §§ 127.1(a)(1), (a)(4), and (e); and 18 U.S.C. § 2)
### Arms Export Control Act

Between at least in or about March 2025, and continuing to at least October 1, 2025, in the District of Utah and elsewhere, the defendant,

**DING WEI CHEN,**

did knowingly and willfully attempt to cause the export from the United States to China of various defense articles, including military-grade satellite modems made by L3Harris (the MPM-2000 and MPM-3000), Viasat (the CBM-400), and Comtech (the SLM-5650B), which were designated as defense articles on the United States Munitions List, without first obtaining the required license or written approval from the Department of State Directorate of Defense Trade Controls,

in violation of 22 U.S.C. §§ 2778(b)(2) and (c); 22 C.F.R. §§ 127.1(a)(1), (a)(4), and (e); and 18 U.S.C. § 2.

## Count 3
### (18 U.S.C. §§ 554(a) and 2)
### Smuggling Goods from the United States

Between at least in or about March 2025, and continuing to at least October 1, 2025, in the District of Utah and elsewhere, the defendant,

**DING WEI CHEN,**

did knowingly buy and facilitate the transportation and concealment of military-grade satellite modems made by L3Harris (the MPM-2000 and MPM-3000), Viasat (the CBM-400), and Comtech (the SLM-5650B), prior to exportation, knowing the same to be

3

intended for exportation contrary to a law and regulation of the United States, that is the Arms Export Control Act and International Traffic in Arms Regulations, in violation of 18 U.S.C. §§ 554(a) and 2.

## Elements of the Offenses

### Count 1
Conspiracy
(18 U.S.C. § 371)

First: the defendant agreed with at least one other person to violate the law.

Second: one of the conspirators engaged in at least one overt act furthering the conspiracy's objective.

Third: the defendant knew the essential objective of the conspiracy.

Fourth: the defendant knowingly and voluntarily participated in the conspiracy.

Fifth: there was interdependence among the members of the conspiracy; that is, the members, in some way or manner, intended to act together for their shared mutual benefit within the scope of the conspiracy charged.

### Count 2
Arms Export Control Act
(22 U.S.C. §§ 2778(b)(2) and (c); 22 C.F.R. §§ 127.1(a)(1), (a)(4), and (e); and 18 U.S.C. § 2)

First: the defendant exported, caused the export of, or attempted to export or cause the export of a defense article;

Second: the defendant failed to obtain a license from the Department of State to export the defense article; and

Third: the defendant acted willfully

**Count 3**
Smuggling Goods from the United States
(18 U.S.C. §§ 554(a) and 2)

First, the defendant knowingly bought or in any manner facilitated the transportation or concealment of merchandise, prior to exportation, knowing the same to be intended for exportation;

Second, the exportation was contrary to a law or regulation of the United States; and

Third, the defendant knew the exportation was contrary to law or regulation.

## AFFIDAVIT IN SUPPORT OF COMPLAINT AND ARREST WARRANT

I, John Cooley, Special Agent of the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), being duly sworn, declare and state the following:

## INTRODUCTION

1. I submit this affidavit in support of a criminal complaint charging Ding Wei Chen (henceforth referred to as "Chen") with crimes related to a scheme to illegally export military-related items from the United States to the People's Republic of China.

2. In addition to myself, the Chen Investigation team is staffed by other Special Agents from HSI and the Department of Defense's Defense Criminal Investigative Service (DCIS). The primary case agents are HSI Special Agent Robert Pinches and DCIS Special Agent Kristi Braine. Special Agents Pinches and Braine have been Special Agents for 14 and 22 years, respectively, and focus on export control and counterproliferation investigations like the Chen Investigation.

3. I am an investigative or law enforcement officer of the United States, within the meaning of 18 U.S.C. § 2510(7), and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

4. I am a Special Agent with HSI and have been so employed since March 2023. As an HSI Special Agent, I have successfully completed the twelve-week Criminal Investigator Training Program (CITP) at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia. At the conclusion of CITP, I completed an additional twelve-week HSI Special Agent Training program at FLETC. As part of my training at FLETC, I received extensive instruction in the areas of Federal Constitutional law, immigration law, customs law, firearms training, investigative and interview techniques, and the Federal Rules of Evidence.

5. As a Special Agent with HSI, my duties include, among other things, the investigation of criminal violations of U.S. import and export laws, including violations of the Arms Export Control Act. As a result, I am familiar with the federal criminal laws related to the unlawful export of arms and commodities from the United States. Moreover, as an HSI Special Agent, I am generally authorized to investigate violations of U.S. laws, to execute search and seizure warrants, and to swear to complaints issued under the authority of the United States.

6. Prior to my appointment as a Special Agent at HSI, I worked as a Special Agent for the New Jersey Department of the Treasury Office of Criminal Investigation for approximately five years between December 2017 and March of 2023. In my state law enforcement role, I primarily conducted criminal tax fraud investigations.

7.     The statements set forth in this affidavit are based on the investigation to date, including undercover communications, observations, and review of information provided to me by other law enforcement officers and individuals involved in the investigation.  I also relied on my training, experience, and background in law enforcement in evaluating this information.  Because this affidavit is being submitted for the limited purpose of establishing probable cause for a complaint, I have not included every fact or source of information establishing violations of federal law.  Furthermore, to the extent that this affidavit references specific dates, amounts or quotations, those dates, amounts, and quotations are approximations.

8.     Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that Chen committed the crimes charged in the complaint.

## LEGAL BACKGROUND

9.     The Arms Export Control Act (AECA) authorizes the President to regulate and control the export of defense-related articles.  To that end, the AECA establishes a United States Munitions List (USML), which identifies and defines the defense articles subject to export controls, and provides for criminal penalties for any willful violation of the AECA or any rule or regulation thereunder.  *See* 22 U.S.C. § 2778(a)-(c).

10.    The United States Department of State, through the Directorate of Defense Trade Controls (DDTC), implements these statutory provisions through the International Traffic in Arms Regulations (ITAR), 22 C.F.R. Parts 120-130.  The ITAR contains the USML, which sets forth twenty-one categories of "defense articles" that are subject to

export licensing controls by the DDTC.  22 C.F.R. § 121.1.

11. The ITAR defines an "export" as, among other things, the sending or taking of a defense article out of the United States in any manner.  22 C.F.R. § 120.50(a). Unless an exemption applies, the AECA and the ITAR prohibit all defense articles from being exported from the United States without a license or other approval from the DDTC.  22 U.S.C. § 2778(b)(2); 22 C.F.R. § 123.1.  Registration with DDTC is "generally a precondition to the issuance of any license or other approval" to export defense articles.  22 C.F.R. Part 122.1(c).

12. Pursuant to the ITAR, it is unlawful for any person, without first obtaining a license or other written approval from DDTC, to export, attempt to export, conspire to export, or cause to be exported any defense article for which a license or written approval is required.  22 C.F.R. § 127.1(a)(1) and (4).  The ITAR also prohibits attempts to violate the AECA or ITAR.  22 C.F.R. § 127.1(e).

13. The DDTC generally does not issue licenses to export defense articles or services to China, which is one of eight countries listed in the ITAR for which the United States has a "policy of denial."  22 C.F.R. §126.1(d)(1).

14. Pursuant to 22 U.S.C. § 2778(c), any person who willfully violates any provision of the AECA or ITAR shall be guilty of a crime.  *See also* 22 C.F.R. § 127.3 (describing penalties for violations of the AECA and ITAR).

15. The Court has jurisdiction and venue over the crimes alleged in this complaint, as each count alleges the defendant committed acts in the District of Utah, as detailed in this affidavit.

16. Federal Rule of Criminal Procedure 4 outlines that the Court has jurisdiction to issue the arrest warrant and complaint if it finds probable cause that the offenses alleged herein have been committed. Arrest warrants do not have to be executed in the District in which they are issued; they can be executed anywhere "within the jurisdiction of the United States." Fed. R. Crim. P. 4(c)(2). This warrant will be executed in the District of the Northern Mariana Islands, which is an unincorporated territory of the United States.

## PROBABLE CAUSE

17. In March 2025, HSI received information that a company based in the People's Republic of China (PRC) (the "PRC Company") was trying to procure items on the USML. Specifically, the PRC Company was referred by a foreign arms broker to a company based in Switzerland (the "Swiss Armorer") that had a U.S.-based subsidiary (the "American Subsidiary").

18. On or about March 23, 2025, the General Manager of the PRC Company ("Co-Conspirator 1") signed a contract to buy eight military-grade satellite modems from the American Subsidiary: the L3Harris MPM-2000 (2), L3Harris MPM-3000 (2), and the Viasat CBM-400 (4). The PRC Company and the American Subsidiary also negotiated a separate contract for two Comtech SLM-5650B modems. According to the DDTC, all four of these modems are on the USML. Therefore, a license was required from DDTC to export these modems from the United States to China. Requests for a license to export USML items to China are presumptively denied.

19. On or about April 16, 2025, in connection with the purchase of the above-

described modems, the PRC Company sent the American Subsidiary approximately $33,365. On or about April 23, 2025, the PRC Company sent the American Subsidiary an additional sum of approximately $9,217.14.

20. I have reviewed emails between the PRC Company[1] and a representative of the Swiss Armorer and its American Subsidiary (the "Representative"). The following is a summary of some of those emails:

    a. In a May 29, 2025, email, the Representative wrote to inform the PRC Company that "our account has been closed due to our inability to confirm export licenses for funds transferred from China. . . . As you are aware, we are not permitted to export these items, and the request for detailed supplier information has further exposed our position."

    b. In response, also on May 29, 2025, the PRC Company proposed replacing the contract between the PRC Company and the American Subsidiary with a contract between the PRC Company and the Swiss Armorer and then wiring payment to the Swiss Armorer's bank account. The PRC Company also recommended having the American Subsidiary "deliver the goods to Switzerland in Europe, and then from Switzerland, the goods will be delivered to China."

    c. In email correspondence on or around June 2 and June 3, 2025, the

---

[1] Emails from the PRC Company came from a generic company email address. Some of the emails were signed by Co-Conspirator 1, but many of the emails were not signed. I believe Co-Conspirator 1 was either the primary or sole user of the Chinese Company's email account. I have no reason to believe Chen used the email account.

PRC Company suggested the items be delivered to Saipan, which is the capital of the Northern Mariana Islands, an unincorporated territory of the United States in the western Pacific Ocean. In one email, the PRC Company wrote "I will arrange for personnel to pick up the goods in Saipan." In another email, which was signed by Co-Conspirator 1, the PRC Company listed the ten modems it had ordered and wrote "After I confirm the shipping address and relevant information in Saipan, the United States, you can deliver the goods to Saipan."

d.      In a June 5, 2025, email, the Representative wrote "We are breaking the Law by selling them to you, you know that, so after we have been thrown out of our bank, we are trying to keep this low key." The Representative further wrote "we are NOT putting you in contact with shippers, as they will KNOW IMMEDIATELY that it's going to China."

e.      In response, the PRC Company assured the Representative that "[w]e will not contact your company or the delivery drivers of your suppliers via Chinese phone numbers" and went on to propose using cryptocurrency in the future. In subsequent emails, the PRC Company gave instructions on how to create a use a cryptocurrency "cold wallet," writing "cold wallets are essentially anonymous bank accounts. Each transaction processed through them is private and untraceable."

f.      On June 13, 2025, the PRC Company sent an email to the Representative to inquire about purchasing additional items, including

modems, radios, and electronic countermeasures system for the B-1 bomber. The full list included:

i. Viasat MD-1366 EBEM Modems,

ii. L3Harris Falcon III AN/PRC-117G Tactical Radios,

iii. L3Harris AN/ALQ-161A B-1B Electronic Countermeasures Systems,

iv. Comtech CDM-760 Modular High Speed Modems,

v. ST Engineering iDirect iQ200 Rackmount Satellite Modems,

vi. L3Harris AN/PRC-163 Multi-Channel Handheld Radios,

vii. L3Harris AN/PRC-167 Multi-Channel Manpack Radios,

viii. L3Harris Falcon III AN/PRC-160(V) Wideband HF/VHF Radios, and

ix. Comtech CDM-780 Modular High Speed Modems.

21. On July 3, 2025, the Representative put the PRC Company in touch with an HSI undercover agent (UCA), who was located in the District of Utah and who purported to work for the American Subsidiary in the United States.[2] The PRC Company emailed the UCA the same day. After some back-and-forth, they decided to have a phone call, and the PRC Company provided a contact phone number with a +86 country code, which is the country code for China.

---

[2] I believe that, from this point forward, Chen and the PRC Company believed they were talking to a representative of the Swiss Armorer's American Subsidiary. In fact, they were talking to the UCA, who was located in the District of Utah for all of the phone calls described in this affidavit.

22. On July 3, 2025, during the first phone call between the UCA and the PRC Company representative, the UCA asked if he was talking to Co-Conspirator 1. In response, the representative, who later identified himself as "Chen" (see ¶ 24 below), said "[Co-Conspirator 1] is nearby. I'm the one who . . . pay for the goods." On the same call, the UCA advised Chen that it was illegal to send the items they ordered to China. In response, Chen said "we have a very, you know, perfect way to make sure this thing cannot be, uh, found out by the police or someone else." During this initial call, Chen also acknowledged the prior payments that had been made to the Representative (of the Swiss Armorer and American Subsidiary), saying "we already paid 50 percent of the – for the – for the goods."

23. The next day, the PRC Company emailed the UCA and wrote "Due to the sensitive nature of the products we trade, I suggest you use [an encrypted messaging application ("Encrypted App")] to communicate with us. It is more convenient and secure."

24. On July 7, 2025, the UCA had a call on the Encrypted App with the PRC Company representative. At the start of the call, the speaker confirmed he was Chen, saying "I'm the one who was talking to you last time on the phone," "I'm the one who paid for the goods," "I'm your buyer," and "just call me Chen." Chen went on to state, "the other [person] is [Co-Conspirator 1]" and that "[Co-Conspirator 1] send you the emails, but I'm the one who did – who paid for the money to buy the goods." Chen further explained that [Co-Conspirator 1] does not speak English, but used "AI, ChatGPT or something else" to translate the emails. During this call, the UCA again said "I just

13

want you to know that any of these products going to China will never, ever be approved. So this deal that you want to do is 100 percent illegal," to which Chen replied "Yeah, we kn- -- uh, we know, we know." Chen then went on to state, "we ordered the 10 goods" and referenced L3Harris, Viasat, and Comtech. The number 10 and those manufacturers is consistent with the contracts between the PRC Company and the American Subsidiary referenced in ¶ 18 above.

25. On the same call, Chen also raised "a lot of problems, including the money, the time, the way for me and, uh, [Co-Conspirator 1] to go to Saipan," further explaining it was a "safety problem because me and [Co-Conspirator 1], we sell – we sell weapons." Chen proposed meeting in Singapore instead.

26. After the July 07, 2025, call, Chen exchanged a series of text messages with the UCA on the Encrypted App in a group chat with Chen and Co-Conspirator 1, where Chen re-raised the issues with Saipan and texted the following consecutive messages, "Now the situation has changed. Pls understand our concerns about meet in sapan," and "Singapore is much more safe." The UCA responded and texted, "What are your concerns for Saipan?" Chen replied with consecutive messages and texted, "It's still USA" and "Our goods r illegal u know." The UCA replied and texted, "I understand," and "Please also understand my position. You are asking me to do everything illegal so I am risking a lot. Please help me feel comfortable doing this too." Chen responded and texted, "Yes, I understand, so I agree to meet, but can we choose a safe place to meet?" and "Sapan is not a safe place to meet."

27. Chen subsequently had additional calls with the UCA using the Encrypted

14

App. I have listened to those calls and believe that they are all with the same person, i.e., Chen. The calls are generally about the 10 modems subject to the prior contracts, additional items the PRC Company wants to buy,[3] how to smuggle the items to China, payment logistics, concerns about law enforcement, and the UCA's insistence on meeting Chen and Co-Conspirator 1 in Saipan before consummating the deal.

28. On an August 4, 2025, call on the Encrypted App, Chen asked if he could transfer additional funds via "USDT," which I know is a type of cryptocurrency. The UCA provided his cryptocurrency wallet information and, on August 8 and 15, 2025, the UCA received USDT valued at approximately $21,188.33. On September 28, 2025, the UCA received additional USDT valued at approximately $10,996.[4]

29. Throughout the calls, Chen consistently resisted the UCA's requests to meet in person, instead suggesting the UCA just deliver the goods to intermediaries in the United States. On one call, Chen expressed reservations about going to a "five eyes alliance"[5] country and, on another, expressed concern that the UCA was law enforcement, saying "but if you're FBI or CIA, what happens to us?" The UCA responded that Chen just had to figure out how to get to Saipan.

---

[3] During a call on September 2, 2025, Chen acknowledged the prior emails between the PRC Company and the Representative (of the Swiss Armorer and American Subsidiary). I believe Chen was referencing the requests made in the email referenced in ¶ 20(f) because Chen said the prior emailed request was for "dangerous" items "for the military." Although Chen never referred to the B-1 countermeasures system, he did reference other items from that that request, including "PRC" radios.
[4] The UCA was in the District of Utah when these payments were made.
[5] Five Eyes is a reference to an intelligence alliance comprising of the United States, Canada, United Kingdom, Australia, and New Zealand.

30. In some of his communications with the UCA, Chen referred to the deal to buy 10 modems as a small part of a larger contract, claiming that his customers had already sent them all of the money for the full contract to procure tens of millions of dollars' worth of goods. For example, on July 8, 2025, Chen said they had a contract for ¥130,000,000 RMB (which I understand to be worth approximately $18.2 million), and that "the 130 million is only about a quarter of the whole plan."

31. The calls also reveal Chen's knowledge of U.S. law. For example, on one call, on September 2, 2025, Chen referenced the International Traffic in Arms Regulations, noting that some of the items the PRC Company had contracted to buy are on the "I-T-A-R list," which I understand to be a reference to the USML. The UCA also specifically mentioned the illegality of the deal to Chen on several occasions. For example, the UCA said "this is not legal in any way," "this deal is illegal," and "any of these products going to China will never, ever be approved, so this deal that you want to do is 100 percent illegal."

32. Chen also complained to the UCA about how the Representative was "unprofessional" for structuring the deal between the PRC Company and American Subsidiary and trying to accept payment directly from China, saying "a deal like this between China and American, normally there should be – there – there should be some company in the middle – in the middle to accept the money to avoid the government to – saw this deal, you know?"

33. Chen also made several different proposals for how to smuggle the goods to China, even indicating that he had past experience with smuggling goods from the United

16

States. For example, during a call on August 15, 2025, between Chen and the UCA, Chen proposed sending the modems to Texas to smuggle through Mexico, saying he had done this before to smuggle other goods. Chen further explained that they typically start by sending legal goods in a "test" shipment, before moving on to smuggling illegal items. He also explained how the network uses anonymous smugglers to remain safe, saying "I don't know the real name there be – because you – you need to make sure everything is safe. They won't provide a real name, just some code." When the UCA remarked that "it's like we're in some type of spy illegal smuggling movie," Chen said "yeah, but these things can make you more, you know? But it's at least it's better than the weed or something else. It's not like a drug."

34. As of October 1, 2025, Chen has remained in communication with the UCA and, according to the UCA, Chen is planning to meet the UCA in Saipan on or around October 6, 2025.

35. According to DDTC, the L3Harris MPM-2000 and MPM-3000 modems and the Viasat CBM-400 and Comtech SLM-5650B modems were and are on the USML.

36. In connection with this investigation, HSI asked the DDTC to conduct a license check on the PRC Company and Co-Conspirator 1. On July 18, 2025, HSI was informed that, after a diligent search, the DDTC found no record of any registration application, export license application, export license grant, or any other written approval provided to the PRC Company or Co-Conspirator 1.

## IDENTIFICATION

37.     On October 3, 2025, a query of a DHS database revealed that a person by the name of Ding Wei Chen is traveling to Saipan, which is within the District of the Northern Mariana Islands. The itinerary and the information the traveler provided is consistent to what Chen told the UCA on their phone calls. Specifically, the traveler is arriving on the same day and reports staying at the same hotel that Chen told the UCA. Finally, the traveler presented an email address that is consistent with Chen's username on the Encrypted App. Therefore, I believe the UCA's communications with "Chen" have been with this now identified individual, Ding Wei Chen.

## CONCLUSION

38.     Based on the foregoing information, there is probable cause to believe Ding Wei Chen committed the crimes charged in this complaint. Accordingly, I request this Court issue an arrest warrant for Ding Wei Chen.

RESPECTFULLY SUBMITTED this 3rd day of October, 2025.

_____
John Cooley
Special Agent, HSI


Subscribed and sworn to before me, this  3rd    day of October, 2025.

_____
CECILIA M. ROMERO
United States Magistrate Judge
District of Utah

APPROVED:

18

FELICE JOHN VITI
Acting United States Attorney

*/s/ Christopher Magnani*
_____
CHRISTOPHER MAGNANI
Trial Attorney
Counterintelligence and Export Control Section
National Security Division
U.S. Department of Justice